An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No.COA25-31

Filed 1 July 2026

Catawba County, No. 22CVS000363-170

JUSTIN MARLOW, EXECUTOR OF THE ESTATE OF MICHELLE MARLOW (Deceased), Plaintiff,

v.

TCS DESIGNS, INC., JOBIE G. REDMOND, JEFF MCKINNEY, and ERIC PARKER, Defendants.

Appeal by plaintiff and defendants from order entered 3 September 2024 by Judge Matthew J. Osman in Catawba County Superior Court. Heard in the Court of Appeals 13 August 2025.

> *White & Stradley, PLLC, by J. David Stradley and Nicole McNamara, and Law Office of Lyndon R. Helton, PLLC, by Lyndon R. Helton, for plaintiff-appellant/cross-appellee.*

> *Pinto Coates Kyre & Bowers, PLLC, by Britney M. Millisor, Richard L. Pinto, and Lyn K. Broom, for defendants-appellees/cross-appellants TCS Designs, Inc., Jobie G. Redmond, and Jeff McKinney.*

> *Goldberg Segalla LLP, by Martha P. Brown, for defendant-appellee Eric Parker.*

DILLON, Chief Judge.

Plaintiff Justin Marlow is the executor of the estate of his wife Michelle

Marlow. This matter involves a 2021 incident where Michelle was fatally shot by a co-worker, Tangela Parker, at the place of their employer, TCS Designs, Inc. ("TCS").

Plaintiff brought this action against TCS and two TCS officers (Jobie G. Redmond and Jeff McKinney), hereinafter collectively the "TCS Defendants," alleging various claims. Plaintiff also alleged claims against Tangela's husband, Eric Parker ("Parker"), who was employed as a manager at TCS.

On 3 September 2024 the trial court entered summary judgment against Plaintiff on *all* his claims against Parker and *some* of his claims against TCS Defendants. Plaintiff appeals from those portions of the summary judgment order. TCS Defendants cross-appeal from the portion of that order denying them summary judgment on Plaintiff's other claims.

As explained below, we conclude Michelle's death arose out of her employment (based on uncontradicted evidence that Tangela shot Michelle because of work-related reasons). And because Plaintiff has not alleged facts giving rise to any *Pleasant* or *Woodson* claims, we must conclude that *all* of Plaintiff's claims should have been dismissed by the trial court as Plaintiff's claims fall within the exclusivity provisions of our Worker's Compensation Act. Therefore, the claims must be litigated in the Industrial Commission.

## I. Background

TCS is a furniture manufacturer. Michelle, Tangela, and Parker were all employed at TCS as factory workers. In January 2021, Tangela intentionally shot

Michelle twice in the head during work hours. Michelle died from the gunshot wounds that day.

The issues on appeal center on whether the trial court lacks subject-matter jurisdiction to consider *any* of Plaintiff's claims, as Defendants contend Plaintiff's *sole* remedies, if any, are available at the Industrial Commission under our Workers' Compensation Act. In his complaint, Plaintiff asserted common law claims for negligence, gross negligence, and willful or wanton conduct, seeking both compensatory and punitive damages.

This appeal is the second to come before us in this matter. The first appeal occurred prior to Defendants' answer, as they had only filed Rule 12(b) motions.

In the first appeal, we considered whether the allegations in Plaintiff's complaint, taken as true, and other evidence offered at the hearing showed Plaintiff's claims were, in fact, barred by the exclusivity provision of the Act, warranting dismissal of this action. In an opinion filed 2 May 2023, we held the trial court did not err in *denying* Defendants' Rule 12(b) motions "to the extent they were based on the exclusivity provision of the Act." *Marlow v. TCS Designs, Inc.*, 288 N.C. App. 567, 575 (2023) ("*Marlow I*"). We essentially held the evidence before our Court at that stage of the case did not show the Industrial Commission had exclusive jurisdiction over Plaintiff's claims. *Id.* at 573–74. Our Supreme Court later denied Defendants' petition for discretionary review. *Marlow v. TCS Designs, Inc.,* 385 N.C. 318 (2023).

On remand from *Marlow I*, Defendants answered Plaintiff's complaint. The

parties engaged in discovery, after which Defendants moved for summary judgment.

In September 2024, after a hearing on the matter, the trial court entered an order granting summary judgment in favor of Parker (who worked as a supervisor) on all claims and for TCS Defendants on Plaintiff's claims of gross negligence, willful wanton conduct, and for punitive damages. However, in that order, the trial court denied TCS Defendants' summary judgment motion based on negligence, i.e., that these Defendants were negligent in hiring/retaining Tangela as an employee.

Significant to this appeal, the trial court also determined it could revisit the subject-matter jurisdiction question (e.g., whether or not Plaintiff's claims are barred by the Act) at the summary judgment stage based on evidence uncovered during discovery, notwithstanding our decision in *Marlow I*.

Plaintiff appeals the portion of the order granting summary judgment for Parker and for TCS Defendants on his claims for gross negligence and willful and wanton conduct. TCS Defendants cross-appeal the portion of the order denying their summary judgment motion on Plaintiff's claims based on ordinary negligence.

## II. Appellate Jurisdiction

We first address our jurisdiction to consider the trial court's order. That is, the order being appealed is interlocutory, as *some* claims against TCS Defendants survive. And usually, "[t]he denial of a motion for summary judgment is an interlocutory order and is not appealable." *Harris v. Walden*, 314 N.C. 284, 286 (1985). However, an appeal may be taken from an interlocutory order when the order

affects a substantial right. N.C.G.S. §§ 1-277(a), 7A-27(b)(3)(a).

We have held "the denial of a motion concerning the exclusivity provision of the [Act] affects a substantial right and thus is immediately appealable." *Est. of Belk v. Boise Cascade Wood Prods., L.L.C.*, 263 N.C. App. 597, 598 (2019) (citation omitted). Thus, we have jurisdiction to consider TCS Defendants' cross-appeal.

Regarding Plaintiff's appeal, Plaintiff argues the trial court's order granting summary judgment against him as to some claims affects a substantial right, as a failure to consider his appeal at this time creates the possibility of inconsistent verdicts. *See Cook v. Bankers Life & Cas. Co.*, 329 N.C. 488, 491 (1991). Whether Plaintiff is correct, because we have jurisdiction over TCS Defendants' appeal, in our discretion and in the interest of judicial economy, we also review the merits of Plaintiff's appeal at this time. *See Ayscue v. Griffin*, 263 N.C. App. 1, 9 (2018).

## III.    Standard of Review

We review a trial court's rulings on summary judgment motions de novo. *Town of Pinebluff v. Moore Cnty.,* 374 N.C. 254, 255 (2020) (citation omitted). In our review, we must view "the evidence in the light most favorable to the non-movant[.]" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (citation omitted). We also review challenges to subject-matter jurisdiction de novo. *Azure Dolphin, LLC v. Barton*, 371 N.C. 579, 594 (2018) (citations omitted).

## IV.    Analysis

As Plaintiff's claims arise from the death of his wife caused by an assault at

work by a co-worker, we begin by addressing whether Plaintiff's claims, in fact, are subject to the exclusivity provision of the Act.

## A. Subject-Matter Jurisdiction

Plaintiff seeks damages from his wife's employer and from certain officers and employees of the employer for his wife's death.

TCS Defendants argue Plaintiff's claims fall within the Act and that, therefore, the trial court lacks subject-matter jurisdiction over Plaintiff's common law claims based on the exclusivity provision in the Act. *See* N.C.G.S. §§ 97-9, 97-10.1; *see also Burgess v. Gibbs*, 262 N.C. 462, 467 (1964) (holding the trial court lacks subject-matter jurisdiction to consider claims which fall under the Act).

The Act applies to injuries (1) caused by an accident, (2) "arising out of [ ] employment," and (3) that occurred "in the course of employment." *Pickrell v. Motor Convoy, Inc.*, 322 N.C. 363, 366 (1988) (citation omitted). The only prong in dispute in this case, as discussed in *Marlow I*, is the second prong, "whether Michelle's death *arose out of her employment*." 288 N.C. App. at 572 (emphasis added).

### 1. Law of the Case Doctrine

We first consider whether our statement in *Marlow I*—that Michelle's death "arose out of her employment"—became the "law of the case" which should not have been revisited at the summary judgment hearing. Plaintiff argues reconsideration of the issue was foreclosed by *Marlow I*.

We disagree. The trial court was able to consider new evidence on the issue

uncovered during discovery which was not considered during the pleading stage in *Marlow I*, specifically new evidence showing Tangela's *reason* for shooting Michelle.

The evidence before the trial court at the Rule 12(b) hearing prior to *Marlow I* revealed three interactions between Tangela and Michelle.

The first interaction occurred in July 2020 when Tangela became irate at Michelle when Michelle complained to Tangela that Tangela was singing too loudly in the workplace:

> Tangela had her earphones on and was singing at a level that Michelle could hear in spite of having her own earphones in. When Michelle asked Tangela if she could lower her voice[,] Tangela became irate and stated she could not ask her to do anything she had to ask her supervisor to discuss it with her.

*Id.* at 569 (alteration in original). As explained below, this "disagreement" between Michelle and Tangela arose from the employment. However, no violence immediately resulted from this interaction, which occurred six months before the shooting.

The second interaction occurred almost six months later, on 4 January 2021, nine days before the shooting. The complaint and evidence at the Rule 12(b) hearing showed Tangela threatened Michelle, stating that she would " 'wipe the floor' with Michelle and 'whip her a[**].' " *Id.* However, relevant to our analysis, there was *no* evidence or allegation indicating *why* Tangela became irate. In any event, because of her threats, Tangela was suspended from work for three days. *Id.*

The third incident occurred nine days later. On that day, Tangela brought a

gun into the factory and fatally shot Michelle. *Id.* at 573.

In *Marlow I*, relying on precedent from our Supreme Court, we noted under the Act, "the [s]uperior [c]ourt is divested of original jurisdiction of all actions which come within the provision of the [Act]." *Id.* at 572 (quoting *Morse v. Curtis*, 276 N.C. 371, 374–75 (1970)). We concluded in the first appeal that "the pleadings and jurisdictional evidence" offered at the Rule 12(b) hearing were insufficient to show the shooting arose from Michelle's employment: "The pleading and jurisdictional evidence do not show a job-related motivation or some other causal relation between the job and Tangela's shooting of Michelle." *Id.* at 573.

The issue before us in this appeal is whether *Marlow I* foreclosed continued litigation of the jurisdictional issue. Indeed, our Supreme Court has explained any ruling made at the appellate level is generally binding in that same matter on remand under the "law of the case" doctrine:

> [W]hen an appellate court passes on questions and remands the case for further proceedings to the trial court, the questions therein actually presented and necessarily involved in determining the case, and the decision on those questions become the law of the case, both in subsequent proceedings in the trial court and on a subsequent appeal, provided the same facts and the same questions, which were determined in the previous appeal, are involved in the second appeal.

*Tennessee-Carolina v. Strick Corp.*, 286 N.C. 235, 239 (1974) (citations omitted).

Our Supreme Court, however, has also held it was appropriate for a trial court to reconsider its prior decision under certain circumstances. *See, e.g., Devereux v.*

*Devereux*, 81 N.C. 12, 17 (1879) ("[I]t [is] the duty of the courts to adhere to their decisions and not to reverse the same unless the [decisions] were made hastily, or some material point was overlooked, or some controlling authority was omitted to be brought to the attention of the court[.]"). This is true even if the information may have been previously known to the parties and could have been presented at a prior hearing *when the issue concerns the trial court's subject-matter jurisdiction over the matter*, as the parties cannot confer subject-matter jurisdiction on a court by their actions/inactions. *See, e.g., State v. Fisher*, 270 N.C. 315, 318 (1967) (holding that "parties cannot, by consent, give a court" subject-matter jurisdiction over a matter).

Our Court, too, has held that "when a tribunal is faced with a question of its subject matter jurisdiction, . . . the goals of the law of the case doctrine are outweighed by the overriding importance and value of a correct ruling on this issue." *Wellons v. White*, 229 N.C. App. 164, 179 (2013) (citations and marks omitted); *see also McAllister v. Cone Mills Corp.*, 88 N.C. App. 577, 579 (1988) (holding a trial judge did not err in reconsidering the issue of subject-matter jurisdiction at the summary judgment stage despite a different trial judge ruling on the issue earlier).

It is true the trial court on remand could not overrule our holding in *Marlow I* that, *based on the evidence before the trial court at the Rule 12(b) hearing*, the trial court had jurisdiction over Plaintiff's claims. However, in this case, the trial court at the summary judgment hearing on remand heard additional jurisdictional evidence uncovered during discovery. Specifically, uncontradicted evidence, including

deposition testimony of Tangela, shows the reason Tangela became irate during the second interaction: Tangela testified she became angry when Michelle placed work equipment in the middle of a walkway (a potential issue under OSHA), blocking Tangela's path to and from her workstation. Accordingly, we conclude the trial court did not err by reconsidering its jurisdiction over Plaintiff's claims.

### 2. Arising Out of Employment

We now consider whether the trial court correctly determined that Michelle's death arose out of her employment.

" '[A]rising out of the employment' refers to the origin or cause of the accidental injury." *Withers v. Black*, 230 N.C. 428, 432 (1949) (citations omitted). An injury arises out of employment "when it occurs in the course of the employment and is a natural or probable consequence or incident of it." *Id.* at 433 (citation omitted).

Unlike for a common-law tort claim, an injured employee *need not prove her injury was foreseeable* to recover worker's compensation benefits:

> There must be some causal relation between the employment and the injury; but, if the injury is one which, after the event, may be seen to have had its origin in the employment, it need not be shown that it is one which ought to have been foreseen or expected.

*Id.* (citation omitted); *see also Aldridge v. Hasty*, 240 N.C. 353, 359 (1954) (in the common-law tort context, "[f]oreseeable injury is a requisite to proximate cause, and proximate cause is a requisite for actionable negligence"); *Lockey v. Cohen, Goldman & Co.*, 213 N.C. 356, 360 (1938) (but in the worker's compensation context, "[i]t need

not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence").[1]

Here, Tangela was Michelle's co-employee at TCS Designs. In situations where one co-employee assaults another co-employee, our Courts have concluded that the injury "arose out of employment" where there is some connection between the employment and the motivation of the assault.

In *Withers*, our Supreme Court was confronted with whether an intentional assault by an employee on a co-employee fell within the provisions of the Act. 230 N.C. at 432. There, a plaster apprentice was often "charged" with being too slow. *Id.* at 430. On the day of the incident, the claimant was plastering a wall on a jobsite, but the apprentice was impeding the work, so the claimant told the apprentice "to get

---

[1] Consider this example from a treatise explaining the role, or lack thereof, of the concept of "foreseeability" in the Workers' Compensation context:

> [S]uppose that a wheel flew off a high-speed machine, and splashed molten metal from a vat onto the controls of a sprinkler system, which, in turn, set off the sprinklers, which wet a hot light bulb, which exploded just as claimant was yawning, with the result that claimant swallowed a piece of glass. Any such set of improbabilities, of the sort familiar to first-semester tort students, would at an early stage pass out of the bounds of foreseeability, if the word has any connection with reality at all. And yet, if claimant was working at his or her job, there can be no doubt that claimant is entitled to compensation, for the injury was clearly connected with the work, although the causal sequence was unforeseeable.

1 Larson's Workers' Compensation Law § 3.06.

out of the way," which prompted an argument between the two. *Id.* The apprentice left the room for about ten minutes and then returned only to throw a "hod of mortar" at claimant's face, causing significant vision loss. *Id.*

Our Supreme Court held the assault *did* arise out of employment, reasoning the two men "had no personal contacts extraneous to their employment[,]" and the assault stemmed from a quarrel between the claimant and the apprentice "over the work which they were performing for their common employer[.]" *Id.* at 433. The Court then explained an "industrial truth":

> Where men are working together at the same work disagreements may be expected to arise about the work, the manner of doing it, as to the use of tools, interference with one another, and many other details which may be trifling or important. Infirmity of temper, or worse, may be expected, and occasionally blows and fighting. Where the disagreement arises out of the employer's work in which two men are engaged, and as a result of it one injures the other, it may be inferred that that the injury arose out of the employment.

*Id.* at 434 (citation omitted); *see also Conrad v. Cook-Lewis Foundry Co.*, 198 N.C. 723, 726–27 (1930) (holding the injury stemming from an intentional assault "arose out of employment" after two employees engaged in a disagreement over their work).

Similarly, in another early case, our Supreme Court concluded an employee's death arose out of his employment when he was struck by a co-employee after prolonged friction between them over work issues. *Helger v. Cannon Mills Co.*, 224 N.C. 669, 670–71 (1944) ("Undoubtedly the friction between the two employees, which

continued with intermittent bickering for nearly a year, had its origin in the employment. While the assault may have resulted from anger or revenge, still it was rooted in and grew out of the employment." (citation omitted)).

Twelve years later, our Supreme Court was again tasked with determining whether the shooting of employees by a co-employee "arose out of and in the course of their employment[.]" *Zimmerman v. Elizabeth City Freezer Locker*, 244 N.C. 628, 632 (1956). There, a hot-tempered, younger employee, ultimately shot at several employees and customers, killing three. *Id.* at 631. On the morning of the shooting, the young employee had reported to his draft board's office but was late in his reporting. *Id.* This prompted the clerk to "severely reprimand[ ]" him in front of other draftees. *Id.* He left angrily, returned home, retrieved a rifle, walked to his place of employment, and began shooting. *Id.* It appears he suffered from a mental disturbance, and desired to kill those who "dominated" him. *Id.* at 632–34. There was also evidence that in the weeks leading up to the shooting, this young employee had negative work interactions with each of the co-employees he shot (or attempted to shoot). *Id.* at 630–31. And "[t]here [was] no evidence tending to show that any friction arose between [the young employee] and any of his fellow employees over any matter except in connection with his employment." *Id.* at 632.

Our Supreme Court concluded the injuries "occurred 'in the course of' the employees' employment[,]" as they occurred at work while the employees were engaged in their work and then examined the "arose out of employment" requirement.

*Id.* at 634. The Court ultimately held the requisite causal connection between the injuries and employment existed, even assuming that the young employee's humiliation at the draft board was a trigger of the shooting, and thus that the injuries arose out of employment. *Id.* at 635. The Court reasoned the young employee was upset with his co-employees dominating him, and the only context they dominated him was in work. *Id.*

However, in another early case, our Supreme Court concluded that an injury at the hands of a co-worker did not arise out of employment but was due to "domestic trouble between the two men[.]" *Harden v. Thomasville Furniture Co.*, 199 N.C. 733, 733–36 (1930). The Court explained:

> [I]f one employee assaults another *solely* under the impulse of anger, or hatred, or revenge, or vindictiveness, not growing out of but entirely foreign to the employment, the injury should be treated as the voluntary act of the assailant and not as one arising out of or incident to the employment.

*Id.* at 735–36 (emphasis added).[2]

Therefore, while it is true that an assault motived "solely under the impulse of anger, or hatred, or revenge, or vindictiveness[ ]" does not fall under the Act's

---

[2] Unrelated to our case, we note our Court has held that sexual harassment by a co-employee might not generally be seen as arising from the employment. *See Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 496 (1986). In *Hogan*, our Court held an employer's negligent retention of an employee who sexually harassed the plaintiff could proceed beyond the summary judgment phase and that the Act did not bar her claim. *Id.* at 495–96. We explained "[s]exual harassment is not a risk to which an employee is exposed because of the nature of the employment but is a risk to which the employee could be equally exposed outside the employment." *Id.* at 496 (citation omitted).

purview, *see id.*, we must examine the root cause and origin of the assault and determine whether it "grew out of the employment[,]" *Helger*, 224 N.C. at 671. Additionally, the work-related incidents need not directly precipitate the injury. *See, e.g., id.* at 670 ("Friction developed between the two[ ] which continued for nearly a year[.]"); *Zimmerman*, 244 N.C. at 630 ("Only a few weeks before the shooting . . . . About six weeks prior to [the shooting.]").

Here, Tangela and Michelle were engaged in a work-related argument nine days prior to the shooting, resulting in Tangela's suspension. That interaction, as was the interaction six months before, were premised on each woman's interference with the other's work. *See Withers*, 230 N.C. at 434. Again, we note that whether these prior actions made Tangela's decision to shoot Michelle "foreseeable" is not relevant in determining whether Michelle's injuries arose out of her employment, so long as Tangela's motivation to shoot Michelle was work-related.

Additionally, there was evidence uncovered during discovery that, on the day of the shooting, Tangela stated Michelle "owed her $500" after Tangela's suspension. The shooting was clearly "rooted in" work and "grew out" of their shared employment. *See Hegler*, 224 N.C. at 671.[3]

---

[3] Contrary to Plaintiff's suggestion that the statement raises a mere suspicion that Tangela shot Michelle over the money she lost while suspended, this evidence along with the prior work disputes over work-related issues and the lack of relationship between the two women raises an inference that Michelle's death arose out of employment. *See Withers*, 230 N.C. at 434 ("Where the disagreement arises out of the employer's work in which two men are engaged, and as a result of it one injures the other, *it may be inferred that the injury arose out of the employment*." (emphasis added and citation omitted)).

Therefore, according to how this Court and our Supreme Court have previously decided cases where one co-employee physically assaults another co-employee, we must conclude Michelle's death arose out of her employment with TCS Designs.

## B. Plaintiff's Remaining Claims

Of course, our Supreme Court has determined that an employee may still bring common law claims against her employer or a co-worker for injuries otherwise falling within the Act in limited circumstances. Plaintiff argues that some of his claims fall within these exceptions. We now turn to address these claims.

### 1. *Pleasant* Claims

While Plaintiff's claims arising from ordinary negligence (or no negligence) by an employer must be heard by the Industrial Commission, Plaintiff argues Parker's negligence in his role as a supervisor, rose to the level of that in *Pleasant*. Specifically, Plaintiff points to evidence suggesting that Parker knew that his wife (Tangela) might be violent towards Michelle. We disagree.

In *Pleasant*, our Supreme Court permitted a negligence claim against a co-worker to proceed—despite the exclusivity provision in the Act—where it is shown that the co-worker's conduct arose to "willful, wanton, and reckless negligence." *Pleasant v. Johnson*, 312 N.C. 710, 717 (1985).

Our Court has explained that "willful, wanton, and reckless negligence is present when a co-employee intentionally fails to carry out some duty with manifest indifference to the consequences resulting from that failure." *Est. of Vaughn v. Pike*

*Elec., LLC*, 230 N.C. App. 485, 500 (2013). Our Supreme Court has also instructed that a plaintiff bears a heavy burden of proof when alleging a *Pleasant* claim. *See, e.g.*, *Trivette v. Yount*, 366 N.C. 303, 310 (2012).

We conclude Plaintiff's *Pleasant* claim fails. Even assuming Parker owed a duty to Michelle, Plaintiff has failed to come forward with evidence that satisfies *Pleasant's* exacting standard. *See id.* at 312 ("[E]ven unquestionably negligent behavior rarely meets the high standard of 'willful, wanton and reckless' negligence established in *Pleasant*."). Although Plaintiff asserts Parker acted with reckless disregard for Michelle's rights and safety, Plaintiff fails to allege Parker *intentionally failed to carry out* some duty he owed to Michelle. *See Vaughn*, 239 N.C. App. at 500.

Thus, we conclude Plaintiff has failed to assert a claim and present evidence to make out a *Pleasant* claim. Accordingly, we conclude the trial court did not err in granting summary judgment in favor of Parker.[4]

### 2. Negligence Claims

Additionally, Plaintiff's allegations in his complaint necessarily defeat his contentions that the Industrial Commission lacks jurisdiction over his claims arising from alleged ordinary negligence by TCS Defendants.

In *Bryant v. Dougherty*, the Supreme Court was confronted with the question

---

[4] Plaintiff has not alleged a *Woodson* claim against TCS Designs, *see Woodson v. Rowland*, 329 N.C. 330, 340–41 (1991), nor a *Woodson* claim against Defendants Redmond and McKinney, *see id.* at 347–48. Because Plaintiff has failed to allege either claim, Plaintiff has abandoned the issues on appeal, *see* N.C. R. App. P. 28(b)(6).

of whether the Act applied to an employer-recommended doctor's treatment of an employee who was injured on the job. 267 N.C. 545, 546–47 (1966). After explaining the general rule, that once bound by the Act, the Act works to "exclude all other rights and remedies in [the employee's] favor against the employer[,]" the Court explained that certain common law rights, those wholly disconnected from employment, are not barred by the Act. *Id.* at 548 (citations omitted) ("The Act does not, however, take away any common law right of the employee, even as against the employer, provided the right be one which is disconnected with the employment and pertains to the employee, not as an employee but as a member of the public.").

Our Court reiterated this reasoning in *Wake Cnty. Hosp. Sys., Inc. v. Safety Nat. Cas. Corp.*, 127 N.C. App. 33 (1997). We explained that "if [the decedent's] estate contended and established that her death was due to the [employer's] negligent breach of some duty owed [to] her, not as an employee but as a member of the public, it could maintain an action at common law to recover for such negligence." *Id.* at 42.

Plaintiff, however, in his complaint suggests only duties owed by Defendants which arose because of Michelle's employment rather than duties that are owed to the general public. Indeed, the duties owed relate solely to their employer-employee or supervisor-employee relationships.

## V.  Conclusion

Based on the foregoing, we conclude all of Plaintiff's claims are preempted by the Act. We hold Defendants were entitled to summary judgment on all Plaintiff's

claims in their entirety. We affirm the portion of the trial court's order which held as such and reverse the portion which denied, in part, TCS Defendants' motion for summary judgment.

AFFIRMED IN PART AND REVERSED IN PART.

Judges COLLINS and WOOD concur.

Report per Rule 30(e).